**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JERRY GILLESPIE, )<br>)<br>Plaintiff )<br>)<br>vs. )<br>)<br>KENNETH BOUDREAU; JOHN HALLORAN; )<br>JAMES O'BRIEN; MICHAEL CLANCY; )<br>SERGIO RAJKOVICH; DANIEL MCDONALD; )<br>THOMAS RICHARDSON; ROBERT )<br>SCHAEFER; WILLIAM FOLEY (through his )<br>representative/estate); DAVID EVANS; JOHN )<br>MCHUGH; ASA JULIE NELSON; ASA CHUCK )<br>BURNS; CITY OF CHICAGO; COOK )<br>COUNTY; COOK COUNTY STATE'S )<br>ATTORNEY'S OFFICE. )<br>)<br>Defendants. )<br>)<br>) | **Case No.**<br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff JERRY GILLESPIE, for his complaint against Kenneth Boudreau; John

Halloran; James O'Brien; Michael Clancy; Sergio Rajkovich; Daniel McDonald; Thomas

Richardson; Robert Schaefer; William Foley (through his representative/estate); David Evans;

John McHugh; ASA Julie Nelson; ASA Chuck Burns; City Of Chicago; Cook County; and Cook

County State's Attorney's Office, alleges as follows:

**INTRODUCTION**

1.     Plaintiff Jerry Gillespie is an innocent man who spent twenty years incarcerated

for crimes he did not commit.

1

2.     Plaintiff was coerced into giving a false confession during a corrupt investigation led by some of the most notorious police detectives in Chicago Police Department history, including William Foley, Kenneth Boudreau, and John Halloran.

3.     The detectives who caused Plaintiff's wrongful conviction are responsible for dozens of false, coerced confessions.

4.     Due to Defendants' egregious misconduct, Plaintiff was wrongfully convicted of the murder of Jeffrey Rodgers in 1994.

5.     Plaintiff always maintained his innocence and his wrongful conviction was eventually overturned. On April 12, 2024, Plaintiff's Petition for a Certificate of Innocence was granted.

6.     Plaintiff seeks damages for injuries inflicted upon him from the persons responsible for this miscarriage of justice.

**JURISDICTION AND VENUE**

7.     The actions of the Defendants violated the United States Constitution, the Civil Rights Act, 42 U.S.C. §§ 1983, 1985 and 1986, as well as Illinois and common law.

8.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and over his state law claims pursuant to the court's supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

9.     Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiff's claims also occurred in this judicial district.

## PARTIES

10.     Plaintiff Jerry Gillespie is a 49-year-old resident of Chicago, Illinois. After spending twenty years incarcerated for a crime he did not commit, he is making up for lost time with his family, working, and raising his son.

11.     Defendant William Foley, who is deceased and therefore sued by and through his representative/estate, was a Chicago Police Department detective at certain times relevant to this complaint.

12.     Defendants Kenneth Boudreau, John Halloran, James O'Brien, Michael Clancy, Sergio Rajkovich, Daniel McDonald, Thomas Richardson, Robert Schaefer, David Evans, and John McHugh were Chicago Police Department employees at times relevant to this complaint. Together with Foley, they are referred to as the "Officer Defendants."

13.     Defendant City of Chicago is an Illinois municipal corporation, and as such is responsible for the policies, practices and customs of the CPD, its OPS, its Personnel Division, its Detective Division, and its Superintendent of Police, as well as those of the Mayor, his office, and the Chicago City Council, the Corporation Counsel's Office, and the Chicago Police Board. The City of Chicago is and/or was the employer of each of the Officer Defendants. The City of Chicago is responsible for the acts of the Officer Defendants while employed by the City of Chicago.

14.     Defendants Julie Nelson and Chuck Burns were Assistant Cook County State's Attorneys at certain times relevant to this Complaint. Together, they are referred to as the "ASA Defendants."

15.     Defendants Cook County and the Cook County State's Attorney's Office are governmental entities within the State of Illinois. At certain times relevant to this action, Cook

County and the Cook County State's Attorney's Office were the employer of the ASA Defendants.

## FACTUAL ALLEGATIONS

### Jeffrey Rodgers is Murdered

16.     On February 10, 1993, Jeffrey Rodgers was a 35-year-old barber working at the Universal Beauty Salon at 5522 South Racine in Chicago, Illinois.

17.     That evening, men wearing ski masks entered the salon. Rodgers was shot in the head multiple times and killed.

18.     Plaintiff was innocent of Mr. Rodgers's murder and had nothing to do with it. No physical or forensic evidence ever tied Plaintiff to Mr. Rodgers's murder.

### The Case Goes Cold

19.     Chicago Police Department detectives interviewed witnesses at the barbershop where Rodgers was murdered, but according to the police reports, none of the witnesses identified a shooter.

### A Task Force Is Assigned and Gillespie is Arrested

20.     The Chicago Police Department assigned a task force to clear the Rodgers homicide along with two other homicides: Arlesia Davis, who was murdered at 5756 South May Street on February 8, 1993, and Walter Rule, who was murdered at 1859 West 53rd Street on February 9, 1993.

21.     To develop suspects, the Officer Defendants decided to conduct a neighborhood sweep to arrest and interrogate residents without probable cause.

4

22.     On February 18, 1993, Officer Defendants, including McDonald, Foley, Clancy, and Rajkovich, stopped Plaintiff and arrested him despite having no reason to believe he was involved in any crime they were investigating.

23.     Plaintiff was taken to the Chicago Police Department Area One headquarters.

24.     The Officer Defendants kept Plaintiff detained and refused to let him leave Area One or return home even though they had no basis to suspect him of involvement in a crime.

**Defendants Detain Gillespie Incognito and Fabricate His "Confession"**

25.     Plaintiff was interrogated multiple times while in custody by Officer Defendants, including Foley, Clancy, and McDonald. He gave several exculpatory statements in which he disavowed any involvement in the Rodgers homicide.

26.     Plaintiff was subjected to coercive, threatening, intimidating, and physically abusive interrogation tactics employed by Officer Defendants culminating in Plaintiff signing a false "confession" they had prepared.

27.     Those tactics included lies, threats, false promises, and more.

28.     The Officer Defendants refused to let Plaintiff go home and kept him detained at the station.

29.     Other Officer Defendants, including Evans, McHugh, O'Brien, and McDonald, joined the scheme to obtain a false statement from Plaintiff. Officer Defendants, including McDonald, Clancy, and Foley, told Plaintiff that someone else had implicated him in a homicide or homicides and attempted to get Plaintiff to confess.

30.     Officer Defendants, including Defendant Foley, physically and mentally coerced Plaintiff during the interrogation.

5

31.     Officer Defendants, including Defendant Foley, threatened that the abuse would continue if Plaintiff didn't go along with what they wanted him to say.

32.     Officer Defendants made false promises of leniency to Plaintiff.

33.     Officer Defendants, including Clancy and Foley, questioned Plaintiff, fed him false information about the crime, and described a scenario where Plaintiff acted as a lookout while others murdered Rodgers.

34.     Officer Defendants denied Plaintiff access to food, drink, sleep, and bathroom while they worked to coerce his false "confession."

**Defendant ASA Julie Nelson and the Officer Defendants Interrogate and Fabricate a Statement from Plaintiff**

35.     Defendant Nelson was an assistant state's attorney employed by Defendants Cook County and Cook County State's Attorney's Office at the time Plaintiff was arrested and interrogated.

36.     While he was in police custody, and before charges had been filed, Plaintiff told Defendant Nelson that police officers had harmed him physically or threatened him. Defendant Nelson ignored his complaints.

37.     By ignoring Plaintiff's cry for help, Defendant Nelson communicated to Plaintiff that he had no choice but to cooperate with the police and regurgitate the false confession that had been fed to him.

38.     Defendant Nelson interrogated Plaintiff and took a false and coerced statement from him that was used against him at his criminal trial.

39.     Defendant Nelson fabricated a statement from Plaintiff that he had not been mistreated by the police even though Plaintiff had told her that the police officers harmed him physically and/or threatened him.

6

40.     The Officer Defendants and Defendant Nelson knew that Plaintiff's confession was false and that any cooperation by Plaintiff was the result of physical and mental coercion and false promises of leniency.

41.     Because of his mistreatment, including mental and physical coercion, false promises of leniency, and having his complaints about his abusive treatment go ignored, Plaintiff signed a false "confession" stating that he had served as a lookout during the Rodgers murder.

42.     The Officer Defendants hid that they had originated the false information contained in Plaintiff's complaint.

**The Officer Defendants Suppress Exculpatory Information Regarding Johnell Alexander**

43.     A key detail in Plaintiff's coerced and false "confession" was that Johnell Alexander had ordered him to serve as a lookout in the Rodgers murder.

44.     Officer Defendants, including Boudreau, had arrested and questioned Alexander, who denied ordering Plaintiff or anyone else to commit the Rodgers murder.

45.     However, the Officer Defendants failed to submit this information to the prosecutors in the Rodgers murder, so it was suppressed from Plaintiff and he did not learn it until after his criminal trial.

46.     Officer Defendants, including Boudreau, conducted lineup identification procedures involving Alexander. However, they again failed to submit this information to the prosecutors in the Rodgers murder, so it was suppressed from Plaintiff and he did not learn it until after his criminal trial.

**Defendants Commit Further Coercion and Fabrications**

47.     The Officer Defendants coerced additional witnesses and fabricated additional evidence as part of their scheme, including evidence still unknown by Plaintiff.

48.     As just one example, after Officer Defendants, including Boudreau, questioned Alexander, they called the victim's family in Alexander's presence to let the family know that Alexander was released, in order to intimidate Alexander and threaten his safety.

49.     The Officer Defendants, including McHugh and Evans, fabricated witness statements from eyewitness Colleen Lashley that were used in the criminal trial against Plaintiff, and fed her information about the crime and the crime suspects with the purpose that she would falsely repeat it as coming from her own knowledge and experience.

50.     The Officer Defendants withheld the means they used to fabricate Lashley's false inculpatory statement from the prosecution and Plaintiff and his lawyers.

51.     The Officer Defendants, including McHugh, Evans, McDonald, Halloran, and Boudreau, coerced a fabricated a statement from Willie Hughes implicating Plaintiff in the Rodgers homicide.

52.     ASA Defendant Chuck Burns, alongside Defendant Halloran, reinterviewed Hughes and coerced a fabricated statement from Hughes implicating Plaintiff.

53.     The Officer Defendants, including Halloran, Boudreau, Clancy, and Schaefer fabricated a statement from James Clark implicating Plaintiff in the Rodgers homicide.

54.     ASA Defendant Chuck Burns, alongside Defendant Halloran, re-interviewed Clark and suppressed exculpatory statements from Clark, who refused to sign a written statement.

55.     On information and belief, the Officer Defendants physically abused and coerced false statements from other witnesses during their investigation.

56.     Officer Defendants, including Richardson, went to Ms. Franklin's house to conduct a search. Those Defendants lied to Ms. Franklin and told her that her son would not be

charged with a crime if she gave them permission to search her house, but that her son would be charged with a crime if she didn't give them permission.

**Gillespie is Wrongly Convicted**

57.     Plaintiff was charged with first-degree murder as a result of the individual Defendants' misconduct.

58.     Based on his fabricated and coerced "confession," as well as additional false evidence fabricated by Defendants, Plaintiff was convicted of first-degree murder on June 16, 1994 and sentenced to forty years in prison.

**Gillespie's Wrongful Conviction is Overturned**

59.     In 2024, Plaintiff's conviction was vacated.

60.     Plaintiff subsequently received a Certificate of Innocence.

**The City of Chicago's Policies, Practices, and Customs
Caused Plaintiff's Wrongful Conviction**

61.     The City is responsible, by virtue of its policies, practices, and customs, for inflicting miscarriages of justice in scores of incidents like the one Plaintiff endured.

62.     Since 1982, over 150 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to cause the convictions of innocent people for serious crimes they did not commit.

63.     In these cases, CPD officers used the same or similar tactics Officer Defendants employed against Plaintiff here, including abusing and coercing suspects into falsely implicating themselves, fabricating evidence, or suppressing material information.

64.     At all relevant times, members of the CPD, including Officer Defendants, routinely manufactured evidence against innocent people by coercing, manipulating, threatening,

pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent people, knowing full well those statements were false.

65.     Some Officer Defendants involved in wrongfully convicting Plaintiff had been supervised by Jon Burge, who was responsible for the torture of dozens of Chicagoans at his own hands and by the officers he supervised.

66.     As a matter of widespread custom and practice, members of the CPD, including Officer Defendants, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own, enabling police to secure the wrongful convictions of innocent people.

67.     Over a decade before Plaintiff was framed via a coercive interrogation, the Defendant City of Chicago had notice that its detectives were terrorizing people into confessing. This practice, which began with Jon Burge and others under his watch at Area Two and then Area Three was in full force in the late 1970s, throughout the 1980s, and into the 1990s and beyond. The City learned about these practices in 1982 when Andrew Wilson and Jackie Wilson were tortured—Andrew was tortured so badly that the jail would not even take him. The City knew, or should have known, that these practices continued when Burge and other officers tortured Aaron Patterson and Eric Caine in 1986, with Patterson even etching into a bench he had been tortured.

68.     The City knew, or should have known, that the coerced and fabricated confession practice extended beyond Areas Two and Three and beyond Burge and his closer associates into other parts of the City and involving other officers in the 1980s and 1990s.

69.     For example, in 1991, Defendant Boudreau, with Detective Michael Kill, participated in the coercive interrogation of Anthony Jakes that resulted in a confession that was

physically impossible. Jakes was a child at the time. In 1992, Boudreau, with Burge and others, participated in the coordinated coercion of a group of Black teenagers, Marcus Wiggins, Damoni Clemon, Iamari Clemon, Jesse Clemon, Tremaine Green, Clinton Welton, and Diyez Owens, none of whom stand convicted despite the claim they "confessed."

70.     The City knew, or should have known, that Detective Kriston Kato and others were fabricating and torturing confessions from people out of Area Four Detective Division, including abusing Frederick Seaton in 1988, Michael Waslewski and Daniel Gasca in 1990, and Andre Wallace in 1994.

71.     Likewise, the City knew, or should have known that Detective Reynaldo Guevara and others, based out of Area Five, were fabricating and coercing confessions as well, including abusing Victor Vera in 1989, Elizer Cruzido in 1993, and Gloria Ortiz Bordoy in 1995.

72.     The City knew, or should have known, that the pattern of coercion reached Area Six. For example, Daniel Taylor, Deon Patrick, Lewis Gardner, Rodney Matthews, Paul Phillips and others were coercively interrogated in 1992 by detectives based out of Area Six.

73.     What happened at Area One in the 1990s was no different than the abuse perpetuated in other police Areas, including by Officer Defendants here.

74.     The murder of Rodgers is far from the only time Defendants Halloran and Boudreau, often joined by others, have worked together to "close" a case regardless of the evidence. Nor is it the first time that these detectives used physical and psychological coercion, including exploiting an existing physical or mental vulnerability, to do so. Rather, as part of the City's larger practices, these detectives have a longstanding pattern of such misconduct.

75.     Numerous men have had charges dropped, been acquitted, or had their convictions overturned, notwithstanding "confessions" taken by Defendants Halloran, Foley,

O'Brien, and/or Boudreau. Examples of individuals against whom Halloran, Boudreau, Foley, and their cohorts have coerced or fabricated confessions include, but are not limited to: Mickey Grayer, Johnny Plummer, Clayborn Smith, Harold Hill, Dan Young, Peter Williams, Kilroy Watkins, Tyrone Hood, Wayne Washington, Emmett White, Tyrone Reyna, Miguel Morales, Nicholas Escamilla, John Willer, Raphael Robinson, Fred Ewing, Darnell Stokes, Derrek Flewellen, Anthony Williams, Nevest Coleman, Daryl Fulton, Oscar Gomez, Abel Quinones, Sean Tyler, Reginald Henderson, William Ephraim, Antoine Anderson, Joseph Jackson, Jerome Weathers, Stanley Gardner, Arnold Day, Javan Deloney, Cortez Brown, Frank Bounds, and Curtis Mislap. Like the tactics inflicted on Plaintiff, the acts were designed to generate false confessions to crimes.

76. Not long after interrogating Plaintiff, Boudreau and Foley would also use similar tactics to "solve" an Englewood cold case, this time by interrogating and fabricating statements from Jerry Fincher, Harold Richardson, Vincent Thames, Michael Saunders, and Terrill Swift. While the Fincher statement was suppressed, the other individuals were wrongfully convicted and served significant sentences before being exonerated after DNA evidence proved the confessions were false.

77. After the Englewood Four were exonerated, the FBI discovered an insider's account of how those false confessions were obtained. Former Assistant State's Attorney Terrence Johnson revealed that detectives, including Defendants Foley and Boudreau, told the Englewood Four they could go home if they cooperated by confessing to the crime and implicating others. They were told "witnesses go home." Johnson further reported that the detectives created a "cheat sheet" to help them keep their stories straight when testifying at the subsequent motions to dismiss brought by the Englewood Four.

78.     The wrongful convictions of innocent persons include numerous cases in which Chicago police detectives used the very same tactics that Officer Defendants employed against Plaintiff in this case. These tactics include: (a) psychological intimidation and manipulation; (b) the suppression and concealment of exculpatory information, including fabricated information; and (c) the use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, without regard to their actual guilt.

79.     Before and during the period in which Plaintiff was falsely charged with and convicted of murder, Defendant City knowingly operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the City's disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct. This allowed CPD officers to commit misconduct with impunity.

80.     The City failed to provide adequate training to Chicago police detectives and other officers in many areas, including the following: how to conduct interrogations non-coercively, the preservation and disclosure of favorable material to the accused, minimizing the risks of wrongful conviction, risks of tunnel vision, and need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process.

81.     In fact, some of the City's training encouraged abusive, unconstitutional conduct.

82.     The need for training in these areas was (and remains) obvious. The City's failure to adequately train Chicago police officers caused Plaintiff's wrongful conviction and his injuries.

13

83. The CPD also failed to appropriately supervise its officers. The Department of Justice ("DOJ") issued a report finding systemic deficiencies in supervision and training mirroring the allegations here.

84. Before and after Plaintiff's arrest, City policymakers and department supervisors condoned and facilitated a code of silence within the CPD. In accordance with this code, officers refused to report and lied about misconduct committed by other officers, including the misconduct at issue in this case.

85. The City has admitted the code of silence exists.

86. As a result of these City practices, members of the CPD believe they may, and often do, act with impunity when they violate the constitutional and civil rights of citizens.

87. Part and parcel of its practice of fostering egregious misconduct, the CPD has a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from witnesses and suspects in criminal cases, which has caused false confessions and led to wrongful convictions, described above.

88. In so doing, CPD officers systematically suppressed exculpatory and impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

89. The practice of obtaining coerced and false confessions by CPD has had, for decades, a concomitant practice involving Felony Review Unit Assistant State's Attorneys ("FRU ASAs") reporting to the police station to purportedly "memorialize" statements and "confessions" allegedly voluntarily made by the suspect.

90. The FRU ASAs work alongside officers approving statements, as done here.

91.     At all relevant times, the CCSAO typically staffed the FRU with new, young prosecutors. The FRU attorneys faced pressure to go along with and approve police-generated statements because appeasing police officers could "make or break" their careers. These CPD practices caused Plaintiff harm here, including via the involvement of the FRU ASAs here.

92.     The City has condoned, ratified, and sanctioned the kind of misconduct that Defendants committed against Plaintiff in this case. The City (including its final policymaking officials) failed to act to remedy the patterns of abuse described herein, despite knowledge of the pattern of misconduct.

### Plaintiff's Damages

93.     For twenty years, Plaintiff was forced to live in a cage for a crime he did not commit. Plaintiff was required to live in conditions that were inhumane and damaging to his health. During his wrongful incarceration, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, attend funerals, and participate in other life events with loved ones, and was deprived of the fundamental freedom to live his life as an autonomous human being.

94.     This time was emotionally, physically, and psychologically dehumanizing and debilitating, and Plaintiff has suffered from fear, anxiety, despair, boredom and loneliness.

95.     Plaintiff also suffered from the loss of sustained contact with his family, and was prevented from holding gainful employment or pursuing educational opportunities outside the prison walls.

96.     Plaintiff continues to live under the effects of his isolation and incarceration, and under the stigma of his wrongful conviction.

**COUNT I - 42 U.S.C. § 1983**
**Due Process**
**(Fourteenth Amendment)**

97.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

98.     The Officer Defendants and ASA Defendants individually, jointly, and in conspiracy, caused the wrongful charging, prosecutions, convictions, and imprisonment of Plaintiff.

99.     Additionally, these same Defendants, caused the continuation of that wrongful conviction.

100.     These Defendants caused and/or continued Plaintiff's wrongful charging, prosecution, conviction and imprisonment by committing or causing to be committed one or more of the following acts: physically and mentally coercing, constructing and fabricating the false and totally unreliable confession which formed the basis for Plaintiff's charging, prosecution, conviction, re-prosecution and re-conviction; by knowingly manufacturing and fabricating false witness testimony; by suppressing exculpatory evidence; by writing false reports; and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the United States Constitution.

101.     Additionally and/or alternatively, the Defendants named above failed to intervene to stop Plaintiff's wrongful prosecution and conviction despite having the opportunity to do so.

102.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

103.    The misconduct described in this Count by the Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT II- 42 U.S.C. § 1983
### Coercive Interrogation
### (Fifth and Fourteenth Amendments)

104.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

105.    The actions of the Officer Defendants and Defendant Nelson, individually, jointly, and in conspiracy, in coercively interrogating Plaintiff and using torture techniques which "shock the conscience" during said interrogations, resulted in the false, coerced, and fabricated confession that was subsequently used against Plaintiff in his prosecution, and thereby violated Plaintiff's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law as guaranteed by the United States Constitution.

106.    The Officer Defendants and Defendant Nelson used torture and other coercive techniques to interrogate Plaintiff and/or encouraged, condoned, and permitted the use of said techniques, and/or failed to intervene to stop the coercive interrogation of Plaintiff.

107.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

108.    The misconduct described in this Count by the Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT III – 42 U.S.C. § 1983
### Deprivation of Liberty without Probable Cause
### (Fourth and Fourteenth Amendments)

109.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

110.    In the manner described more fully above, the Officer Defendants and ASA Defendants, individually, jointly, and in conspiracy with one another, used false evidence that they had manufactured to accuse Plaintiff of criminal activity and to cause the institution and continuation of criminal proceedings against Plaintiff, without probable cause.

111.    In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

112.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

113.    The misconduct described in this Count by the Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT IV - 42 U.S.C. § 1983, 1985, 1986
### Conspiracy to Deprive Constitutional Rights

114.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

115.    The Officer Defendants and ASA Defendants, together with named and/or other unsued co-conspirators, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional overt acts set forth in the facts above.

116.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

117.    The misconduct described in this Count by the Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

### COUNT V- 42 U.S.C. § 1983
### *Monell* Policy Claim Against the City of Chicago

118.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

119.    The actions of the Officer Defendants, as alleged above, were done pursuant to one or more interrelated de facto policies, practices and/or customs of the Defendant City of Chicago.

120.    At all relevant times and for a period of time prior thereto, the City and its final policymakers failed to promulgate proper or adequate policies or procedures for: the conduct of interrogations and techniques to be used when questioning criminal suspects; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; maintenance of investigative files and disclosure of those files in criminal proceedings; disclosure of exculpatory and/or impeaching evidence; the collection, documentation, preservation, and testing of evidence; and conducting photographic and live lineup procedures. The City and its final policymakers failed to promulgate adequate policies or procedures on these topics (although the need for such policies and procedures was obvious, given the recurring situations faced by officers) in order to prevent the violation of citizens' constitutional rights.

121.    In addition, the City and its final policymakers failed to promulgate proper or adequate policies or procedures for training and supervision of CPD officers on these topics.

122.    The failure to promulgate proper or adequate policies or procedures was committed by persons with final policymaking authority in the CPD and the City.

123.    At all relevant times and for a period of time prior thereto, there existed widespread practices and customs among officers of the CPD, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent or have an attorney present; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers such that the coercive interrogations continued unchecked.

124.    In addition, at all relevant times and for a period of time prior thereto, there existed widespread practices and customs among officers of the CPD, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers

20

fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

125. At all relevant times and for a period of time prior thereto, the City and its final policymakers had notice of the above-referenced widespread practices and customs. This includes widespread practices and customs under which individuals designated as suspects in criminal investigations, such as Plaintiff, were routinely deprived of their right to due process or Fifth Amendment rights. For instance, it was common that suspects were prosecuted based on coerced confessions and fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures, and that exculpatory and impeaching evidence was suppressed.

126. At all relevant times and for a period of time prior thereto, the City and its final policymakers had notice of widespread practices and customs under which individuals designated as suspects in criminal investigations, like Plaintiff, were routinely coerced against their will to implicate themselves in crimes of which they were innocent. It was common for suspects interrogated by the CPD to falsely confess, under extreme duress and after suffering abuse, to committing crimes to which they had no connection and for which there was scant evidence to suggest they were involved.

127. The widespread practices and customs described above, individually and together, were allowed to flourish because the leaders, supervisors, and final policymakers of the City directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers on these topics, and by

failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

128.    The above-described widespread practices and customs, so well settled as to constitute de facto policies of the City, were able to exist and thrive, individually and together, because final policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

129.    The policies, practices, and customs set forth above have resulted in numerous well- publicized false confessions, including the one at issue here, where individuals were convicted of crimes they did not commit after being subjected to abusive interrogation techniques.

130.    In addition, the misconduct described herein was undertaken pursuant to the policies and practices of the City in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City.

131.    Officer Defendants acted pursuant to the City's policies, widespread practices, and customs in engaging in the misconduct described in this Complaint. Plaintiff's injuries were caused by the City's policies, widespread practices, and customs.

132.    Specifically, Plaintiff's injuries were caused by the policies, widespread practices, and customs of the City in that officers and employees of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced suspect and witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated constitutional rights in a manner similar to that alleged here.

133. The widespread practices described in the preceding paragraphs were also allowed to flourish because the City declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and suspect or witness statements, and pursued wrongful convictions.

134. Indeed, the CPD's systems for investigating and disciplining officers accused of the type of misconduct that harmed Plaintiff were, for all practical purposes, nonexistent. The CPD code of silence effectively eliminated any form of accountability, discipline, or oversight. Chicago police officers who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed de facto immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter the cost. In this way, the City caused abuses like Officer Defendants' misconduct at issue in this case.

135. Because of Defendant City's policies, widespread practices, and customs, Plaintiff suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

## COUNT VI – State Law Claim
## Malicious Prosecution

136. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

137. Officer Defendants and the ASA Defendants, acting as investigators, accused Plaintiff of criminal activity, knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

138. Officer Defendants and the ASA Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.

139.    These judicial proceedings were instituted and continued maliciously, resulting in injury.

140.    Officer Defendants and the ASA Defendants' statements regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. Defendants also fabricated evidence, coerced false inculpatory statements from witnesses, withheld exculpatory evidence that would have demonstrated Plaintiff's absolute innocence, destroyed material and/or exculpatory evidence, and used unduly suggestive identification procedures.

141.    Officer Defendants and the ASA Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in Rodgers's murder.

142.    Officer Defendants and the ASA Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual perpetrators. Defendants withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

143.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in disregard of the truth and Plaintiff's innocence.

144.    Plaintiff was eventually found innocent and the prosecution terminated in his favor.

145.    Because of Defendants' misconduct, Plaintiff suffered, and continues to suffer, grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

## COUNT VII – State Law Claim
## Intentional Infliction of Emotional Distress

146.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

147.    The acts and conduct of the Officer Defendants and ASA Defendants as set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority and were undertaken with intent to cause, or were in reckless disregard of, the probability that their conduct would cause severe emotional distress to Plaintiff, as is more fully alleged above.

148.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's innocence.

149.    Because of Defendants' misconduct, Plaintiff suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional distress and damages, as set forth above.

## COUNT VIII – State Law Claim
## Civil Conspiracy

150.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

151.    As described above, Officer Defendants and the ASA Defendants, together with named and/or other unsued co-conspirators, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

152.    In furtherance of the conspiracy, Officer Defendants and the ASA Defendants committed overt acts and were otherwise willful participants in joint activity including, but not limited to, the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

153.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

154.    Because of Defendants' conspiracy, Plaintiff suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

## COUNT IX – State Law Claim
### Willful and Wanton Conduct

155.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

156.    At all times relevant herein, Officer Defendants and the ASA Defendants had a duty to refrain from willful and wanton conduct in connection with the Rodgers murder investigation.

157.    As described herein, it was foreseeable to Officer Defendants and the ASA Defendants that coercing a false confession, fabricating evidence, and suppressing exculpatory evidence, in addition to the other misconduct alleged above, in order to frame Plaintiff, would inevitably result in extreme harm to him.

158.    Notwithstanding that duty, Officer Defendants and the ASA Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

159.    Because of Defendants' misconduct, Plaintiff suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

## COUNT X – State Law Claim
### *Respondeat Superior*

160.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

161.    The Officer Defendants were, at certain times material to this complaint,

employees of the Defendant City of Chicago, were acting within the scope of their employment,

and their acts which violated state law are directly chargeable to the Defendant City under state

law pursuant to respondeat superior.

## COUNT XI – State Law Claim
### Indemnification Pursuant to 745 ILCS 10/9-102 and
### Common Law Claims Against the City and County

162.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

163.    Defendant City of Chicago was the employer of the Officer Defendants at certain

times relevant and material to this complaint.

164.    Defendants Cook County and Cook County State's Attorney's Office were at

certain times material to this complaint the employer of the ASA Defendants.

165.    Said Defendants are therefore responsible for any judgment entered against the

Officer Defendants and ASA Defendants, respectively.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in his

favor against Defendants Kenneth Boudreau; John Halloran; James O'Brien; Michael Clancy;

Sergio Rajkovich; Daniel McDonald; Thomas Richardson; Robert Schaefer; William Foley

(through his representative/estate); David Evans; John McHugh; ASA Julie Nelson; ASA Chuck

Burns; City Of Chicago; Cook County; and Cook County State's Attorney's Office, awarding

compensatory damages, attorneys' fees and costs against each Defendant, punitive damages

against each of the individually named Defendants, pre- and post-judgment interest, equitable

and injunctive relief against the CITY OF CHICAGO, and any other relief this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff JERRY GILLESPIE hereby demands a trial pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**JERRY GILLESPIE**

BY**:**    /s/ Wallace Hilke
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Wallace Hilke
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900

Andrea D. Lyon
Lyon Law
53 W. Jackson Blvd.
Suite 1650
Chicago, IL 60604
(312) 877-5543